## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| Jerrell Cortez Edwards,<br>　　　Petitioner, | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:22cv769 (PTG/WEF) |
| | ) | |
| Harold Clarke,<br>　　　Respondent. | ) | |

### MEMORANDUM OPINION

Jerrell Cortez Edwards ("Petitioner" or "Edwards"), a Virginia inmate proceeding *pro se*, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which challenges the validity of his September 23, 2013 convictions in the Circuit Court of the City of Virginia Beach, Virginia for second-degree murder and felony child neglect. Dkt. 1. On October 19, 2022, Respondent filed a Rule 5 Answer and a Motion to Dismiss, with a supporting brief and exhibits. *See* Dkts. 14–16. On November 14, 2022, Petitioner filed a Motion to Proceed in Support of Habeas Corpus Petition (Dkt. 19), which the Court construed as a response to Respondent's Motion to Dismiss. *See* Dkt. 34 at 2. On May 22, 2023, the Court dismissed Respondent's motion to dismiss without prejudice because it did not comply with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts. Dkt. 27 (citing *Sanford v. Clarke*, 52 F.4th 582, 584, 586 (4th Cir. 2022)). On June 20, 2023, Respondent filed a second Rule 5 Answer and a Motion to Dismiss, with a supporting brief and exhibits. Dkts. 29–31. Petitioner filed a response in opposition. Dkt. 33. Accordingly, this matter is now ripe for disposition. For the reasons that

follow, Respondent's Motion to Dismiss must be granted and the petition will be dismissed with prejudice.[1]

## I. Procedural History

After a multi-day jury trial commencing on September 17, 2013, Edwards was convicted in the Circuit Court of the City of Virginia Beach for the second-degree murder of two-year old J.L., in violation of Virginia Code § 18.2-33,[2] and felony child neglect of J.L., in violation of Virginia Code § 18.2-371.1(B).[3] *See* Dkt. 31-2 at 9–10. J.L. was the son of Laquita Lewis, Edwards's girlfriend at the time of the murder. *Id.* at 12. On May 6, 2014, the court sentenced Edwards to twenty-five years in prison for second-degree murder and five years in prison for

---

[1] Petitioner has also filed motions for a subpoena *duces tecum* to obtain transcripts of telephone calls he alleges he participated in back in 2019, the appointment of an expert, and an evidentiary hearing. (Dkts. 33-1 at 1–2, 35, 36, 38, 40). These motions will be addressed herein.

Additionally, Plaintiff has filed a Motion to Review (Dkt. 39) a memorandum that Plaintiff had previously filed (Dkt. 37). In the Motion to Review and Memorandum, Plaintiff essentially asks this Court to reconsider its prior decision (Dkt. 34) denying as moot Plaintiff's previously filed Motion to Amend Pleadings (Dkt. 20). *See* Dkt. 39 at 1–2. Plaintiff also asks the Court to consider his pending motions for subpoena *duces tecum*. *Id.* at 1. In issuing this memorandum opinion, the Court has thoroughly considered all the relevant pleadings and motions. Accordingly, the Court will deny Plaintiff's Motion to Review (Dkt. 39) as moot.

[2] Virginia's felony murder statute provides that "[t]he killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act other than those specified in §§ 18.2-31 and 18.2-32, is murder of the second degree and is punishable by confinement in a state correctional facility for not less than five years nor more than forty years." Va. Code Ann. § 18.2-33. In this case, the felonious act was felony child abuse in violation of Va. Code Ann. § 18.2-371.1(B).

[3] The felony child abuse statute states, in relevant part, that "[a]ny parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton, and culpable as to show a reckless disregard for human life is guilty of a Class 6 felony." Va. Code Ann. § 18.2-371.1(B). A Class 6 felony is punishable by "a term of imprisonment of not less than one year nor more than five years, or in the discretion of the jury or the court trying the case without a jury, confinement in jail for not more than 12 months and a fine of not more than $2,500, either or both." Va. Code Ann. § 18.2-10.

felony child neglect. *See* Dkt. 31-1 at 1.  On May 12, 2014, the final judgment order was entered. *Id.* at 2.

Edwards, by counsel, filed a petition for appeal in the Court of Appeals of Virginia that raised three assignments of error:

I. The trial court erred in not granting either Jury Instruction 1A or 1B which contained lesser included offenses because there was credible evidence to support such an instruction beyond a scintilla of evidence.

II. The trial court erred in denying appellant's motion to strike the evidence on the child neglect charge as the evidence was insufficient to show either criminal intent or a criminal negligence beyond ordinary negligence.

III. The trial court erred in denying appellant's motion to strike the evidence on the felony murder charge as the evidence was insufficient on the child neglect charge to supply the necessary malice for the felony murder count.

Dkt. 31–2 at 11.  On February 25, 2015, a judge of the Court of Appeals denied the petition. *See id.* at 45, 56.  Counsel sought review by a three-judge panel. *Id.* at 58.  On May 1, 2015, the panel granted the petition and ordered briefing and oral argument on the first assignment of error regarding the denial of the jury instructions. *See id.* at 60.  The panel denied the second and third assignments of error for the reasons stated in the February 25, 2015 order. *Id.*  In a published opinion issued on December 22, 2015, the Court of Appeals summarized the evidence at Mr. Edwards's criminal trial as follows:

[T]he evidence established that Laquita Lewis, the mother of the two-year-old victim, J.L., and another five-week-old son, was living with appellant on April 5, 2012.  Approximately 7:20 p.m. that evening, she left the children in appellant's care while she attended a class.  According to Lewis, J.L. appeared healthy and uninjured at the time she left the residence.

Appellant texted Lewis during her class.  He told her that J.L. was out of diapers and that the child had cut his lip while appellant was changing his diaper.  Lewis stopped to buy diapers after class and returned home just before 10:00 p.m.  Upon her arrival, she found appellant in the child's room, attempting to perform CPR.  J.L. was unresponsive.  Lewis saw appellant slap J.L.'s face "a couple of times trying to get him to wake up" and saw him attempting chest compressions.  He told Lewis "I don't know [what happened].  I just found him like this."

3

Lewis called 911, and emergency personnel responded approximately seven minutes later. The EMTs who responded noted that the victim's abdomen was distended. They had difficulty establishing an airway for the child, who was not breathing and had no heartbeat. J.L. was taken to the hospital, where he was pronounced dead.

A police officer initially questioned appellant while emergency personnel were attempting to treat the child at the residence. Appellant told the officer that J.L. had been "fussy" that evening, so around 7:30 p.m. he gave the child some juice and laid him down in bed "to put him to sleep to help calm him down." He told the officer that about two hours later, when he went to check on J.L., he noticed that the child had vomit on the side of his mouth and was not breathing. According to appellant, at that point he "started trying to perform CPR" on the child.

When Lewis returned from the hospital after her child's death, she noticed that the bathtub was about one-quarter filled with water. A detective arrived at the apartment and questioned appellant further. Appellant told the detective that he had three shots of vodka at about 6:00 p.m. that evening. He said that J.L. had a temper tantrum when Lewis left for school. He needed to change J.L.'s diaper and had to physically hold the child down, with his hand on the child's chest. While he was doing so, the child flailed about, and hit his mouth on appellant's watch. Appellant said that he took the child to the bathroom to clean the blood from his mouth and then left J.L. in his room with a bottle of water. Appellant went into another room where he had a forty-five-minute video chat with an ex-girlfriend. He ended the conversation just before Lewis was due to come home and checked on the victim. At that time he noticed that the victim was unresponsive and had vomit on his shirt.

At trial, Dr. Jeffrey Gofton, a medical examiner in the Office of the Chief Medical Examiner in Norfolk, testified that he performed an autopsy on J.L. on April 6, 2012. His examination revealed that the child had multiple external injuries to the head that showed signs of healing. The doctor also identified abrasions to the victim's lips and mouth and fresh bruising behind the child's left ear. There were a series of bruises on both sides of the victim's chest, and other internal organs, including the heart, were bruised. Both the liver and stomach had been ruptured internally. J.L.'s autopsy also showed bruising to the large bowel and a fracture line to the liver approximately two inches long and two inches deep. The doctor stated that the injuries to the liver and stomach could not have been caused by misapplied CPR. He explained that typical injuries from CPR are "along the middle [of the body] just overlying the sternum or the breastplate," and J.L.'s injuries were not in that area. The doctor opined that the cause of the child's death was blunt force trauma to the chest and the abdomen.

Dr. Michelle Clayton, a pediatrician, who was qualified as an expert in the field of child abuse, testified that she attended the autopsy and reviewed the victim's medical records. She opined that the abrasions inside J.L.'s mouth could not have been caused by contact with appellant's watch because they were too extensive. She also agreed with the medical examiner that the injuries to the victim's chest were not sustained during CPR. She noted that a significant portion of the child's

circulating blood was found in his abdominal cavity and opined that the victim had been subjected to "severe blunt force trauma of multiple body areas including multiple blows to his face, . . . multiple blows to his chest[,] and . . . severe blunt force trauma to his abdomen." She described a "large purple bruise on [J.L.'s] lower intestine and appendix" and a bruise to the large intestine and surrounding tissue. Dr. Clayton opined that none of the injuries appeared accidental, based on their severity, location, and the "absence of any reasonable accidental explanation."

Appellant testified in his defense. He told the jury that before Lewis left for class, J.L. begged her not to leave. Lewis and J.L. were in another room when appellant "heard her slap him. Then [he] heard boom, boom, and then [he] heard some hollow punches to[o] like it was the chest area." Appellant reiterated his claim that his watch hit the child's mouth while appellant was changing him. Then, to "rinse the blood out of [J.L.'s] mouth," appellant put J.L.'s head under the bathtub faucet "four to five, possibly six" times. He testified that he put the child in bed with a small bottle of water and left the room to video-chat. When he returned to the room, he found J.L. lying face up with vomit on his mouth and shirt. Appellant said that he was trained in adult CPR and that he began performing CPR on J.L. When J.L. did not respond, appellant "panicked" and "started hitting [the child] on his legs, on his chest[,] [] started tapping his sides[,] [] started pinching him trying to get him to react." Appellant further stated that "[he] was tapping his—hitting his face, . . . just trying to get a response out of [the child]." He claimed that he did not intend to hurt the victim.

*Edwards v. Commonwealth*, 779 S.E.2d 858, 859–61 (Ct. App. Va. 2015). The court affirmed

Edwards's convictions. *Id.* at 864 ("we [] affirm the decision of the trial court denying the

proffered jury instructions and affirm appellant's convictions of felony murder and felony child

abuse.").

Edwards, by counsel, filed a petition for appeal in the Supreme Court of Virginia raising

the same three assignments of error he had raised in the Court of Appeals of Virginia. Dkt. 31-3

at 1, 6–9. On June 22, 2016, the Supreme Court of Virginia refused his petition for appeal. *Id.* at

25.

On or about June 10, 2014, while his appeal was pending before the Virginia Court of

Appeals, Edwards filed a petition for writ of habeas corpus in the Circuit Court of the City of

Virginia Beach. Dkt. 31-4 at 1–6. In his petition, Edwards raised the following claims:

A. A police detective "continued to question" Edwards even after he had advised the officer of his intoxication;

B. Police detectives and trial counsel "ignored" Edwards' exculpatory statements, a police detective "removed" such exculpatory portions of his interview from the evidence presented at trial, and trial counsel was ineffective in other respects;

C. Police detectives "coerced" Edwards into giving an "estimate" of various time frames relevant to the offense, and a portion of Mr. Edwards' police interview which would have explained this part of his statement was "omitted" during trial;

D. Trial counsel was very difficult to contact and frequently rejected any potential defenses that the petitioner suggested;

E. Petitioner's trial counsel did not present exculpatory evidence and the trial judge told petitioner that had he been imposing sentence, he would have imposed the maximum sentence;

F. Petitioner was not allowed to "speak the truth"; and

G. Petitioner's trial counsel did not exploit favorable evidence in a manner the petitioner suggests he should have.

*Id.* at 15–16. On October 14, 2014, the circuit court issued a final order finding that Claims A and C and a portion of Claims B, E, and F were barred pursuant to *Slayton v. Parrigan* because the allegations could have been objected to at trial and raised on direct appeal. *Id.* at 16–20 (citing 205 S.E.2d 680, 692 (Va. 1974)). The court also found that Claims D and G, as well as the remaining portions of Claims B, E, and F, failed to state a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* at 16–21. Accordingly, the circuit court dismissed the petition. *Id.* at 21. Edwards did not appeal that decision to the Supreme Court of Virginia.

On August 7, 2018, Edwards, proceeding *pro se*, filed a motion in the circuit court alleging that his convictions were void. Dkt. 31-8 at 3–15. Specifically, he alleged the indictments were defective and that the court lacked personal jurisdiction over him. *Id.* at 4–13. On August 9, 2018, the circuit court denied the motion, finding it was "frivolous and failed to state a cognizable claim." *Id.* at 1. Edwards did not appeal the August 9, 2018 denial of his motion.

6

On June 26, 2022, Edwards executed his federal § 2254 petition. Dkt. 1. The petition alleges he is entitled to federal habeas corpus relief on the following grounds:

1) His counsel was ineffective for failing to present evidence regarding his mental health status and voluntary intoxication at the time of the offense;

2) The evidence was insufficient to convict him of murder;

3) The evidence was insufficient to convict him of child neglect;

4) His counsel was ineffective for failing to move to suppress his statement to the detective; and

5) His counsel was ineffective because he did not question the prosecution's key witnesses, did not obtain an expert witness for the defense, and counsel was merely "going through the motions."

*Id.* at 16–24. Respondent argues that Edwards's petition is untimely. Dkt. 31-8 at 3. The Court agrees.

## II. Statute of Limitations

Under the Anti-terrorism Effective Death Penalty Act ("AEDPA"), a petition for a writ of habeas corpus must be dismissed if filed later than one year after (1) the judgment becomes final; (2) any state-created impediment to filing a petition is removed; (3) the United States Supreme Court recognizes the constitutional right asserted; or (4) the factual predicate of the claim could have been discovered with due diligence. 28 U.S.C. § 2244(d)(1)(A)-(D). To be properly filed, the petition must be delivered in compliance with the applicable laws and rules governing filings, including format and time requirements. *Artuz v. Bennett*, 531 U.S. 4, 8 (2000). The U.S. Supreme Court has emphasized that an untimely state petition is not properly filed. *Pace v. DiGuglielmo*, 544 U.S. 408, 413 (2005).

In this case, Edwards's petition is untimely under § 2244(d)(1)(A). His convictions became final on June 22, 2016, and his federal statute of limitations began to run ninety days later on

Tuesday, September 20, 2016.[4] He did not execute his federal habeas petition until more than five years later on June 26, 2022. Accordingly, absent statutory or equitable tolling, his petition is barred as untimely.

   *A. Statutory Tolling*

   Under AEDPA, a state prisoner must file his petition for a writ of habeas corpus within one year of the completion of the state court direct review process. 28 U.S.C. § 2244(d)(1)(A). In calculating the one-year period, the Court must exclude the time during which any properly filed state collateral proceedings pursued by Edwards were pending. *See* 28 U.S.C. § 2244(d)(2); *see also Pace*, 544 U.S. at 417 (determining that the definition of "properly filed" state collateral proceedings, as required by § 2244(d)(2), is based on the applicable state law as interpreted by state courts).

   Here, as noted earlier, Edwards filed a state habeas petition while his direct appeal remained pending. Edwards's circuit court habeas petition was sworn to on June 9, 2014 and dismissed on October 14, 2015.[5] Edwards did not appeal the October 14, 2015 judgment. Then on June 22, 2016, Edwards's direct appeal concluded when the Virginia Supreme Court denied his petition for appeal. As with the state habeas petition, Edwards did not appeal the denial of his direct appeal. Therefore, for Edwards, AEDPA's one-year limitation period began to run following the June 22, 2016 denial of his direct appeal. Edwards, however, did not file his petition

---

[4] Pursuant to Sup. Ct. R. 13(1), Edwards had ninety days to file a petition for a writ of certiorari to the United States Supreme Court after the Virginia Supreme Court refused his direct appeal on June 22, 2016. He did not do so, and therefore, his conviction became final on September 20, 2016.

[5] The date Edwards signed the state petition is the earliest date on which he could have delivered it to the prison authorities for forwarding to the state circuit court. *See Houston v. Lack*, 487 U.S. 266, 276 (1988).

for writ of habeas corpus in federal court until June 26, 2022, several years after the statute of limitations had lapsed. Accordingly, there is no basis for statutory tolling in this case.

### B. Equitable Tolling

To qualify for equitable tolling, a petitioner must demonstrate that (1) he had been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing. *Pace*, 544 U.S. at 418. A petitioner asserting equitable tolling "'bears a strong burden to show specific facts'" that demonstrate fulfillment of both elements of the test. *Yang v. Archuleta*, 525 F.3d 925, 928 (10th Cir. 2008) (quoting *Brown v. Barrow*, 512 F.3d 1304, 1307 (11th Cir. 2008)). "Equitable tolling is an exceedingly narrow window of relief." *Finch v. Miller*, 491 F.3d 424, 427–28 (8th Cir. 2007) (citation omitted). Indeed, equitable tolling is available only in "rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Green v. Johnson*, 515 F.3d 290, 304 (4th Cir. 2008).

A petitioner generally is obliged to specify the steps he took in diligently pursuing his federal claim. *Spencer v. Sutton*, 239 F.3d 626, 630 (4th Cir. 2001). In addition, the petitioner must "demonstrate a causal relationship between the extraordinary circumstance on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the circumstances." *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000).

Edwards argues he "is entitled to equitable tolling . . . because he is actually innocent of second-degree murder and felony child abuse and neglect." Dkt. 1 at 13. The Supreme Court has recognized actual innocence as a basis for overcoming the expiration of the statute of limitations. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (explaining that "actual innocence, if proved,

serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations"). To establish actual innocence, "[new] evidence must establish sufficient doubt about [a petitioner's] guilt to justify the conclusion that his [incarceration] would be a miscarriage of justice *unless* his conviction was the product of a fair trial." *Schlup v. Delo*, 513 U.S. 298, 316 (1995). A gateway claim requires a petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324.[6] Here, the evidence from trial demonstrates that Edwards's convictions were not a miscarriage of justice. *See Edwards*, 779 S.E.2d at 859–61.

### C. Actual Innocence

Edwards's argument that he is actually innocent is premised upon his own "Declaration," which alleges facts that were known to him at the time of his trial, and were also known and available to him and asserted in his state habeas petition. Dkt. 1-1 at 1–17; *see also* Dkt. 31-4 at 15–20.[7] In his Declaration, Edwards avers that he was on several medications (Neurontin, Flexeril,

---

[6] To the extent Edwards is asserting a free-standing claim of actual innocence, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993); *see McQuiggin*, 569 U.S. at 392 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a free-standing claim of actual innocence."). In addition, as noted below, Edwards does not meet the gateway standard, and therefore he has also failed to meet "any hypothetical freestanding actual innocence claim." *Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 184 (3d Cir. 2017) (citing *Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007)); *House v. Bell*, 547 U.S. 518, 555 (2006) (noting that a freestanding actual innocence claim would require "more convincing proof of innocence" than that needed to meet the gateway standard).

[7] The information that Edwards relies upon consists of medical records and evidence that Lewis was abusive. Edwards knew about his own medical history and his use of prescription pain killers prior to his trial. Edwards also admits in one of his responses that he discussed with his attorney on several occasions his "physical condition and use of prescription pain medication along with drinking alcoholic beverages" before he was left to watch J.L. Dkt. 33-1 at 4, 15. Edwards further admits that he discussed Lewis's physical abuse of J.L. with counsel before trial as well. *Id.* at

Mobic, and Valium) the day of the incident, smoked marijuana, and had consumed considerably more alcohol than he testified to at trial. Dkt. 1-1 at 1–3. He alleged in his state habeas petition that, on the night he was arrested, he told the detective questioning him that he was "not in a conscious state of mind" because he "was intoxicated" and he "had been consuming large amounts of [his] prescription medication[8] in [an] attempt to kill [him]self, as well as try to contain the pains from [his] back injury." *Edwards v. Director*, Case No. CL14-2732, Pet. at 5. In support of his federal habeas petition, Edwards argues that he had been diagnosed with a "mood disorder," that "the responsibility of childcare" fell upon him without notice, and that Lewis was actually responsible for several of J.L.'s injuries. *See* Dkt. 33-1 at 2, 5–6, 10, 14.

Edwards's new version of what occurred between him and J.L. on the night of April 5, 2012 is inconsistent not only with his previous statements to law enforcement, but his own sworn trial testimony as well. *See Sherratt v. Friel*, 275 F. App'x 763, 768 (10th Cir. 2008) (noting that "new evidence must affirmatively demonstrate [ ] [the petitioner's] innocence, not simply undermine the finding of guilt against him"). The principle inconsistencies between his Declaration and the statements to law enforcement and his trial testimony include: (1) how much alcohol he consumed and his use of illegal drugs and prescription medications; (2) the timeline of when different events happened; and (3) Edwards's assertions that it was his "job" "that night" to be attentive and "watch" J.L.  9/18/13 Tr. at 332. Moreover, his allegations of innocence do not refute the unrebutted medical evidence that leaves little doubt that Edwards inflicted J.L.'s fatal injuries, and that those injuries were not the result of his failed attempts at CPR.

---

14–15. To be sure, Edwards testified at trial that Lewis "slapped" and "punche[d]" J.L. several times before she left for class that night. 9/18/13 Tr. at 310.

[8] Edwards identified five prescription drugs: Neurontin, Mobic, Flexeril, Robaxin and Vicodin. *Edwards*, Case No. CL14-2732, Pet. at 5.

### 1. Trial Testimony

At trial, Edwards denied he was on medication that evening and stated that he had three shoots of vodka at about 6:00 p.m. 9/18/13 Tr. at 308, 326–27.[9] Edwards testified that it was his "job with regard to [J.L.] that night" to be attentive and "watch him[;]" and that he "was trying [his] best" that night "to be a protector . . ., at least to" J.L. *Id.* at 332, 335. Edwards also told Detective Coerse, at the scene, that "he was caring for both his child and [Lewis'] child because [Lewis] had left to go to [class]," and that J.L. was not "hurt or injured prior to Ms. Lewis leaving for class." 9/17/13 Tr. at 228, 232.

Edwards testified that when Lewis left around 7:40 p.m., J.L. "stormed" and "ran" to the front door. 9/18/13 Tr. at 307, 322.[10] Edwards told him to go to his room, and J.L. went to his room. *Id.* at 322–23. On direct, Edwards testified that the next time Edwards saw J.L. was approximately 30 minutes later (which would have been around 8:10 p.m.) when Edwards checked on J.L. and decided to change J.L.'s diaper. *Id.* at 311–12. J.L. was uncooperative and J.L. cut his lip on Edwards's watch while Edwards was changing his diaper. *Id.* at 312. Edwards took J.L. to the bathroom to rinse J.L.'s mouth under the bathtub faucet and then took J.L. back to his room, laid him on his futon, and gave him a bottle of water. *Id.* at 313–14. Edwards then left the room and was on a video chat and texting with an ex-girlfriend (Lacy) for between forty-five minutes to an hour. *Id.* at 314. After ending the video chat, Edwards went to check on J.L. and saw vomit

---

[9]  Detective Coerse interviewed Edwards at the scene, and Edwards told Coerse that he had "two or three shots of Smirnoff" before Lewis left, and that he was on Neurontin and Naprosyn but that he had not "taken any of those medications today." 9/17/13 Tr. at 231.

[10]  Lewis testified she left at about 7:20 p.m. and the class was scheduled to start at 7:45 p.m. 9/17/13 Tr. at 171. Lewis also testified that Edwards had been living with her for about five weeks and that he had watched both children while she was at class "once or twice" before and that nothing had happened. *Id.* at 170, 172.

and started CPR. *Id.* at 314–15. Edwards started CPR before he "checked his heart rate." *Id.* at 353.[11]

On cross-examination, Edwards was confronted with several inconsistencies between his trial testimony and his previous statements. Regarding Lewis hitting J.L., Edwards explained that he had not told Detective Hall, other law enforcement officers, or any of the medical personnel, that he had heard Lewis slap J.L. or a "boom, boom," followed by "some hollow punches to like it was to the chest area," before Lewis left for class. *Id.* at 310, 320–22.[12] Edwards explained that he did not tell anyone about the slapping and punching because he "thought that the initial problem was [J.L.] drowned. I thought I caused the drowning." *Id.* at 325.

At trial, Edwards offered inconsistent testimony regarding the evenings' timeline during his direct and cross-examination. On direct, Edwards testified that he checked on J.L. after "forty-five [minutes] to an hour." *Id.* at 314. On cross-examination, Edwards testified that he changed J.L.'s "diaper as soon as [Lewis] left the house" and then rinsed J.L.'s mouth off in the bathtub, and laid him down in his room. *Id.* at 325, 326. Then, he testified that he did not check on J.L. until two hours later. *Id.* In trying to explain the approximate one-hour inconsistency, Edwards testified his "memory [was] horrible." *Id.* at 326.

A second inconsistency concerns Edwards's testimony about when J.L.'s injuries occurred and a different timetable reflected in the text messages about J.L.'s injury. On direct, Edwards

---

[11] In his interview with Detective Hall, Edwards stated that J.L. had a heartbeat when he started CPR. Comm. Ex. 23, (Video at 0:58:38, 0:59:28) (hereinafter "Video at __"). J.L. died about an hour after the EMS personnel started their efforts at resuscitation, which is consistent with 911 being called at about 9:52 p.m., *see, infra* at note 19, and the second page of the pre-sentence report that indicates that J.L. was pronounced dead at "2301 hours."

[12] As previously noted, Edwards had told Detective Coerse that J.L. was not "hurt or injured" prior to Lewis leaving for class. 9/17/13 Tr. at 232.

testified that he had checked on J.L. about thirty minutes after Lewis left the apartment at 7:40 p.m.; this would be approximately 8:10 p.m. when Edwards decided to change J.L.'s diaper. *Id.* at 307, 311. On cross-examination, Edwards testified that he had texted Lewis about J.L. cutting his lip "right after it happened," which Edwards claimed happened while he was changing J.L.'s diaper. *Id.* at 312, 347. However, the text message to Lewis about cutting J.L.'s lip was time stamped 9:14 p.m., which was five minutes after the time stamp for Edwards's text to Lewis about needing diapers. *Id.* at 348–49; Comm. Ex. 11.

J.L. was injured during a roughly three-hour time period. Edwards's own testimony points to a discrepancy in time between when, and for how long, J.L. was injured and when Edwards notified Lewis of these injuries. Edwards's inconsistences do little to support his claim of actual innocence. Neither does his own Declaration.

### 2. Declaration[13]

In his Declaration, Edwards recants much of his sworn testimony at trial averring to consuming large amounts of alcohol, prescription medications, and using illegal drugs.[14] *See* Dkt. 1-1 at 1–3. As is plain from above, Edwards's Declaration is also inconsistent with statements he made to the detectives about consuming alcohol and drugs, as well as the timeline of events.

---

[13] Although Edwards relies on his Declaration to support his claims of ineffective assistance of counsel, there is no indication that the new version of facts, which is inconsistent with his trial testimony, was ever provided to his trial counsel.

[14] Edwards was interviewed by Detective Hall in the early morning hours of April 6, 2012 and denied using any illegal drugs that evening, and stated that he had not taken any of his prescription medications "that day." 9/18/13 Tr. at 249–50; Video at 0:6:20–36. Prior to trial, defense counsel sought to have portions of the video and the television interview redacted and filed a motion in limine on June 10, 2013. Circuit Court Rec. at 24. The circuit court heard the motion on June 11, 2013, and ordered several redactions. 6/11/13 Tr. at 11–17, 17–23, 24–25, 25–27, 28–31, 32–38, 39–40. The ruling was confirmed in an order entered on July 3, 2013. Circuit Court Rec. at 26.

14

In his Declaration, Edwards avers that at approximately 2:30 p.m. that day, he, Lewis, their one-month-old son, and J.L. went to a restaurant where Edwards "consumed approximately three (3) to four (4) [] Long Island Ice Teas at Ms. Lewis' treat." *Id.* at 2. After returning to Lewis's apartment, Edwards's "fatigue and intoxication started to overwhelm [him]" so he went over to his bed and "drifted off to sleep." *Id.* at 3. He awoke at 6:02 p.m. when Lewis and J.L. returned home, and Edwards then consumed more alcohol with Lewis. *Id.* At 6:20 p.m., still drinking alcohol, Edwards and Lewis attempted to play a video game. *Id.* at 4. The two laughed and Edwards smoked another marijuana blunt. *Id.* Lewis stopped playing the video game between 6:55 p.m. and 7:00 p.m. *Id.* At approximately 7:05 p.m., while Lewis was in the bathroom, Edwards took eight Neurontin pills and then smoked a "bowl of synthetic marijuana," hoping he would pass out and sleep through the night. *Id.* Lewis continued to drink additional amounts of alcohol but Edwards refused another drink because he was intoxicated. *Id.* at 4–5. At 7:25 p.m., Lewis, who was having trouble with J.L., called Edwards into the bedroom. *Id.* at 6. Edwards calmed J.L. down, and when he turned around, Lewis had "r[u]n out of the apartment." *Id.* at 6.[15] Edwards noticed J.L.'s diaper needed changing and "feeling remorseful[,]" he "decided to change [J.L.] before he headed to the main bedroom." *Id.*

Edwards wandered from room to room, but could not find any diapers. *Id.* He sat down at 7:35 p.m. and realized that he was "high and tripping . . . off the drugs and attempted to calm down." *Id.* Edwards avers that at 7:38 p.m., he texted[16] Lewis about picking up diapers, and then tended to his five-week old son (not J.L.) by getting him a bottle of milk, which was at

---

[15] Edwards told Detective Hall that Lewis had left at around 7:30 or 7:40 p.m., which was consistent with his trial testimony. Video at 0:8:16; 9/18/13 Tr. at 307.

[16] The timestamp on the text message was 9:09 p.m. 9/18/13 Tr. at 348–49.

approximately 7:41 p.m.[17]  At 7:45 p.m., he checked on both children, and found a "swimmer" diaper/pull-up he thought he could use to change J.L.  *Id.* at 7.  At 7:49 p.m., while changing J.L., Edwards's "hand and watch" accidentally "ma[d]e impact with [J.L.]'s mouth."  *Id.* at 7–8. "Without delay," he consoled J.L. and at 7:59 p.m., he took J.L. into the bathroom to rinse the blood from his mouth.  *Id.* at 8.  At 8:04 p.m. while trying to rinse J.L. off in the bathtub, "the combination of pain; fatigue; and intoxication," caused Edwards to "black[] out/nod[] off" and he fell on top of J.L. causing J.L. to hit his head.  *Id.*  "Unsure of what had happened," Edwards picked up an unconscious J.L. and carried him back to the bedroom to check him for injuries.  *Id.*

At 8:10 p.m., Edwards noticed J.L.'s eyes were open and after he finished checking J.L. for injuries, he assumed J.L. was tired and laid him back down.  *Id.* at 8–9.  Edwards left the bedroom and at 8:15 p.m., he texted Lewis about the injury to J.L.'s mouth.[18]  He then tended to his other child and returned to the bathroom and turned off the faucet as the bathtub was then "halfway filled up."  *Id.* at 9.  Edwards then began a video chat and started a conversation "with his friend Lacey" because he was "trying not to fall asleep and leave the kids unattended."  *Id.*  At 8:43 p.m., Edwards ended the video chat to check on the children and saw J.L. at 8:45 p.m.  *Id.* According to Edwards, J.L. appeared to be watching television so Edwards returned to another room and attempted to play video games.  *Id.* at 9–10.  Still high and "battling depression," Edwards turned the game off at 8:56 p.m. and called his friend back at 9:01 p.m.  *Id.* at 10.

Edwards ended his video chat at 9:20 p.m. and checked on J.L., who he observed was in the same position as he had last seen him.  *Id.*  J.L.'s eyes were open, he was unresponsive and

---

[17]  J.L. was not Edwards's son, but Edwards and Lewis had a child together.  *Id.* at 305, 317–18. Their child was approximately five-weeks old at the time.  *Id.* at 329.  Edwards testified he loved J.L. like "his own child."  *Id.* at 330, 345.

[18]  The timestamp on the text message was 9:14 p.m.  9/18/13 Tr. at 348–49.

Edwards began to "pat his face" and call out his name.[19]  *Id.* at 10–11.  After no response, Edwards,

allegedly "frantic and intoxicated," attempted to open J.L.'s mouth by "squeezing" his

cheeks/jawbone and using his index finger to try and create an airway.  *Id.* at 11.  Edwards then

started chest compressions and seeing no response, he began to pinch J.L.'s ribs, inner thighs, and

inner arms.[20]  *Id.*  Edwards then started compressions, pressing on J.L.'s chest and abdomen.  *Id.*

When he applied pressure to J.L.'s abdomen, "pink and red vomit came out of [J.L.'s] mouth."  *Id.*

Edwards wiped the vomit away, attempted to breathe into J.L.'s lungs, and then began to open

hand "strike his legs," pinch his arms, and pat his face to try and get a response.  *Id.* at 11–12.

Edwards avers that Lewis arrived home at 9:52 p.m., and Edwards called to her for help.  *Id.* at

12.[21]

### 3. Discussion

The actual innocence exception is a difficult standard to meet, and it requires a petitioner

prove that he is factually innocent of the offenses of which he was convicted, not just that his

conviction is legally deficient in some way.  *Bousley v. United States*, 523 U.S. 614, 623 (1998).

---

[19]  Edwards told Detective Hall during the interview at the police station that he discovered J.L., with vomit on his shirt, at 9:40 p.m.  Video at 0:57:20.  In the interview, Edwards admitted that he had just started the CPR comprehensions when Lewis arrived home and he asked her to call 911. This statement was consistent with his statement to Detective Coerse at the scene where Edwards stated he had ended the video chat "just before" Lewis came home "because he didn't want to get caught by [Lewis] talking with his ex-girlfriend." 9/17/13 Tr. at 230.  Edwards avers in his Declaration that Lewis "entered the room" at 9:52 p.m. Dkt. 1-1 at 12.

[20]  At trial and during the interview with Detective Hall, Edwards stated that when he went to check on J.L. after the video chat was over, that is when he noticed the vomit and started CPR. 9/18/13 Tr. at 350.  If Edwards started CPR at or around 9:20 p.m., as he avers in his Declaration, he would have been performing chest compressions for approximately 30 minutes, by himself, until Lewis arrived home and called 911.  Lewis, after she called 911, stated that Edwards continued the compressions for about another "five to ten minutes … until the EMTs arrived." 9/17/13 Tr. at 190.

[21]  Lewis's class ended at approximately 9:35 p.m. and she stopped by the store to pick up diapers on the way home. 9/17/13 Tr. at 174.

A petitioner must support his claim of actual innocence with "new reliable evidence," and must show that "in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 537. *Schlup* instructs that a court must "assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup*, 513 U.S. at 332. As part of this analysis, "the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id.*; *see Komolafe v. Quarterman*, 246 F. App'x 270, 272 (5th Cir. 2007) (holding that the credibility of a recantation affidavit was mitigated when it was not submitted until eight years after a conviction), *cert. denied*, 552 U.S. 1168 (2009). As *Schlup* observed, because the standard is difficult to meet, such claims "are rarely successful." *Schlup*, 513 U.S. at 324.

In proving actual innocence, "recanting affidavits are always viewed with 'extreme suspicion.'" *Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir. 2001) (quoting *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991) (superseded in part on other grounds by U.S.S.G. § 2D1.5(a))); *see United States v. Lighty*, 616 F.3d 321, 375 (4th Cir. 2010) ("Post-trial recantations of testimony are "looked upon with the utmost suspicion.'") (quoting *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973)). Here, Edwards's actual innocence claim relies on his Declaration, which contradicts and recants his own trial testimony, as a basis to toll the habeas statute of limitations so his claims can be heard on the merits. Edwards's new version of what occurred the night of April 5, 2012, however, does not meet the stringent standard of what constitutes a credible claim of actual innocence; and there is no credible explanation as to why the new version is being presented more than eight years after Edwards's trial. *See Smith v. Superintendent*, No. 3:13cv509, 2014 WL 667841, at *9 (N.D. Ind. Feb. 20, 2014) (an actual

innocence claim based on alibi "evidence that directly contradicts [a petitioner's] own sworn testimony" at trial is a "non-starter" and does not establish actual innocence), *aff'd*, 623 F. App'x 798 (7th Cir. 2015), *cert. denied*, 577 U.S. 1159 (2017); *Stinnett v. Dotson*, No. 3:10-0252, 2013 WL 494092, at *3 (M.D. Tenn. Feb. 7, 2013) (an affidavit from a trial witness that contradicts his trial testimony does not "qualify as credible evidence for the actual innocence exception.") (citing *In re Byrd*, 269 F.3d. 585, 606 (6th. Cir. 2001)).

In addition, nothing alleged in support of Edwards's claim of actual innocence challenges either the cause of J.L.'s death or the time during which the fatal blow was struck. The evidence presented at trial established that the fatal blunt force trauma that resulted in the injuries that led to J.L.'s death were inflicted on J.L during a time in which Edwards was the only adult in the apartment. At trial, Dr. Gofton testified about J.L.'s autopsy results and opined that J.L. died from blunt force trauma to "the chest and the abdominal cavity" that resulted in lacerations to his liver and stomach. 9/17/13 Tr. at 155, 158. Dr. Clayton opined that the laceration to J.L.'s liver (four inches wide and four inches deep) and the laceration to his stomach, rendered J.L. unable to eat, run around the apartment, or kick and flail his arms and legs. 9/18/13 Tr. at 288, 290.[22] Edwards's Declaration admits that after Lewis left, he was the only adult in the apartment with his five-week-old son (who was in his swing the entire time) and J.L. Dkt. 1-1 at 6. Edwards avers, as he testified to at trial and in his statement to Detective Hall, that J.L. ran after Lewis when she left. *Id.* Since J.L. was running around after Lewis left, it is unlikely that J.L.'s debilitating and fatal lacerations to his liver and stomach had already occurred. The lacerations to J.L.'s liver and stomach,

---

[22] Under 28 U.S.C. § 2254(e)(1), a federal court must presume a state court's determination of facts is correct unless rebutted by clear and convincing evidence. *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) (factual issue determined by state court "shall be presumed to be correct"); *see also Sumner v. Mata*, 455 U.S. 591, 591–93 (1983) (per curiam) (statutory presumption of correctness applies to state appellate court's rendition of historical facts).

therefore, had to have occurred while Edwards was the only one in the apartment with J.L.[23] Finally, according to Dr. Clayton, those fatal injuries were not the result of CPR. 9/18/13 Tr. at 291. Accordingly, Edwards has failed to establish that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327; *see Sparrow v. Dir., Dep't of Corr.*, 439 F. Supp. 2d 584, 588–89 (E.D. Va. 2006) (rejecting fundamental miscarriage of justice argument when petitioner "introduce[d] nothing new, but present[ed] instead a selective version of the facts and omit[ted] those facts belying his actual innocence claim"). Consequently, Edwards's petition for writ of habeas corpus is not entitled to equitable tolling and is therefore untimely.

In any event, none of the five claims set forth in his petition have merit. *See* 28 U.S.C. § 2254(b)(2); *Swisher v. True*, 325 F.3d 225, 232–33 (4th Cir. 2003) (affirming district court's decision to deny habeas relief on the merits pursuant to § 2254(b)(2), although claim was "clearly unexhausted").

### III. Merits

*A. Claims 1, 4, and 5*

Claims 1, 4, and 5 allege ineffective assistance of counsel, which are reviewed under the highly demanding standard set forth for such claims in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the petitioner has the burden to show both that his attorney's performance was deficient and that he was prejudiced as a result. *Id.* at 687.[24]

---

[23] Edwards acknowledges in his reply that "he is only accountable for injuries inflicted within the window of time under his supervision," which was "2 (two) hours and thirty (30) minutes at best." Dkt. 33 at 7, 8 (citing the 7:20 p.m. through 9:45 p.m. timeframe set forth in his Declaration).

[24] In addition to having no merit, Edwards's allegations of ineffective assistance of counsel are defaulted because they have not been presented to the Supreme Court of Virginia. *See Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in

*Strickland*'s first prong, the "performance" inquiry, "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* A federal court reviewing a habeas petition indulges a "strong presumption" that counsel's conduct fell within the "wide range of reasonable professional assistance." *Id.* at 689. The "basic lesson" of *Strickland* is that "judicial scrutiny" of counsel's performance must be "highly deferential." *United States v. Mason*, 774 F.3d 824, 828 (4th Cir. 2014) (citation omitted). Attorneys "are permitted to set priorities, determine trial strategy, and press those claims with the greatest chances of success." *Id.*

*Strickland*'s second prong, the "prejudice" inquiry, requires showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome [of the proceeding]." *Id.* "'The likelihood of a different result must be substantial, not just conceivable.'" *Valentino v. Clarke*, 972 F.3d 560, 580 (4th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)); *accord Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020). The question is whether the state court, which has "substantial 'latitude to reasonably determine that a defendant has not [shown prejudice],' still managed to blunder so badly that every fairminded jurist would disagree." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). An ineffective assistance of counsel claim may be disposed of on either prong of the *Strickland* test. *See Jones*

---

each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim") (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)). Even though defaulted, as noted above, the claims have no merit. *See, e.g., Guarino v. Clarke*, No. 1:21cv1133, 2022 WL 1750618, at *8 (E.D. Va. May 31, 2022) (recognizing district court's discretion to deny habeas relief on merits of unexhausted claim).

*v. Clarke*, 783 F.3d 987, 991–92 (4th Cir. 2015); *Spencer v. Murray*, 18 F.3d 229, 232–33 (4th Cir. 1994).

<u>Claim 1</u>.  In Claim 1, Edwards alleges counsel was ineffective for not pursuing medical evidence to show that Edwards was intoxicated and under the influence of prescription medications, as well as evidence of his "mental health status." Dkt. 1 at 16.  Edwards admits he discussed these matters with counsel[25] and counsel chose instead to present Edwards's testimony, which attempted to place the blame for the injuries on Lewis and portray Edwards as a person who cared for J.L.  *See* 9/18/13 Tr. at 306–18.  Counsel's choice of which defense to pursue is understandable given Edwards's statements to the detectives denying he was intoxicated or that he had taken his prescription medications that day.  9/17/13 Tr. at 231; Video 0:05:30–0:06:37.[26] Counsel also likely knew that Edwards did not exhibit any signs that he was intoxicated during the approximately ninety-plus minute interrogation.  This interrogation occurred within a few hours of when, according to his Declaration, Edwards had consumed large amounts of alcohol, smoked a blunt, smoked a bowl of marijuana, taken eight Neurontin capsules, was "battling fatigue," and was falling in and out of sleep. Dkt. 1-1 at 10.  Contrary to the Declaration, the video establishes that Edwards was alert, responsive, and engaged with Detective Hall with no difficulty.  Video 0:00:30–1:38:28.

The claim is also based upon a misunderstanding of Virginia law regarding voluntary or involuntary intoxication—neither of which is a defense to second-degree murder.

> [I]nvoluntary intoxication only negates *mens rea* if the accused can show that he met the legal standard for insanity—that he did not understand the nature, character, and consequences of his act or that he was unable to distinguish right from wrong— at the time he committed the offense.  The accused may not put forth expert evidence of his mental state as to his specific intent, pursuant to an involuntary

---

[25]  Dkt. 33-1 at 4, 14–15.

[26] Edwards consistently stated to the detectives that he only had two or three shots of vodka earlier, around 6:00 p.m., and that he had not taken any of his prescription medication that evening. 9/17/13 Tr. at 231; Video 0:05:30–0:06:37.

> intoxication defense, unless the evidence shows that he passed the legal threshold of insanity due to his involuntary intoxication. Therefore, a defendant who pleads involuntary intoxication in this situation must comply with the statutory requirements for putting on an insanity defense. Involuntary intoxication is not a back-door way for the introduction of expert evidence of a defendant's mental state.

*Schmuhl v. Commonwealth*, 818 S.E.2d 71, 82 (Ct. App. Va. 2018). The rule is similar for

voluntary intoxication.

> Generally, voluntary intoxication is not an excuse for any crime." *Wright v. Commonwealth*, 234 Va. 627, 629, 363 S.E.2d 711, 712 (1988) (citing *Boswell v. Commonwealth*, 61 Va. (20 Gratt.) 860, 870 (1871)). To date, Virginia courts have held that "Virginia recognizes only one exception to this rule: voluntary intoxication can negate the deliberation and premeditation required for first degree murder." *Id.* Appellant urges us to adopt a second, heretofore unrecognized exception, for murder by lying in wait. Voluntary intoxication is only relevant to the issue of premeditation if the defendant is charged with first-degree murder based on a premeditated, malicious killing. *Herbin v. Commonwealth*, 28 Va. App. 173, 183–84, 503 S.E.2d 226, 231 (1998). Thus, "[t]he defendant may [only] negate the specific intent requisite for capital or first-degree murder by showing that he was so greatly intoxicated as to be incapable of deliberation or premeditation," and thereby reduce the conviction from first-degree murder to second-degree murder. *Essex v. Commonwealth*, 228 Va. 273, 281, 322 S.E.2d 216, 220 (1984).

*Tisdale v. Commonwealth*, 778 S.E.2d 554, 556 (Ct. App. Va. 2015); *see also Jenkins v. Commonwealth*, 423 S.E.2d 360, 367 (Va. 1992) (observing that the court had previously rejected a diminished-capacity defense, holding that "'evidence of a criminal defendant's mental state at the time of the offense is, in the absence of an insanity defense, irrelevant to the issue of guilt.'") (quoting *Stamper v. Commonwealth*, 324 S.E.2d 682, 688 (Va. 1985)). Consequently, Edwards's alleged intoxication does not support a claim that counsel's decision to pursue a different theory was unreasonable. *See Williams v. Kelly*, 816 F.2d 939, 950 (4th Cir. 1987) (counsel is not ineffective "merely because he overlooks one strategy while vigilantly pursuing another"); *see also United States v. Mason*, 774 F.3d 824, 828 (4th Cir. 2014) (Counsel "need not raise every possible claim to meet the constitutional standard of effectiveness," and is "permitted to set priorities, determine trial strategy, and press those claims with the greatest chances of success").

23

Further, the Supreme Court of Virginia, in interpreting the term "willful act" in Virginia Code § 18.2-371.1(B), has held that a "'willful act' imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury." *Barrett v. Commonwealth*, 597 S.E.2d 104, 111 (Va. 2004). *Barrett* went on to hold that the conduct is not evaluated "in a vacuum" and "it must be viewed in light of all the circumstances preceding and surrounding the tragic event." *Id.* In *Barrett*, the facts established that the defendant had consumed a "six-pack of beer" "on her 'night out'" and that she fell asleep on the couch leaving no one to watch her two children. *Id.* at 110–12. *Barrett* found that the defendant's intoxication had, in part, "created a situation 'reasonably calculated to produce injury, or which [made] it not improbable that injury [would] be occasioned, and [she knew], or [was] charged with the knowledge of, the probable results of [her] acts.'" *Id.* at 111 (quoting *Cable v. Commonwealth*, 415 S.E.2d 218, 220 (Va.1992)).

Here, like in *Barrett*, the evidence available to counsel at trial established that Edwards knew he was watching "both" children. 9/17/13 Tr. at 228. Pursuing a defense that involved voluntary intoxication, while knowing you were responsible for taking care of a child,[27] was not going to negate an inference of a willful act or omission. Thus, counsel did not act unreasonably in trying to present Edwards as someone who attempted to help J.L. when he found him in extremis. 9/18/13 Tr. at 391–95; *see also supra* at 11–12. Moreover, Edwards cannot establish prejudice because, as stated previously, the physical evidence and medical testimony overwhelmingly establish that the person who likely inflicted J.L.'s fatal wounds was Edwards. Therefore, Claim 1 has no merit under either prong of *Strickland*.

---

[27] Edwards was also taking care of his own five-week-old child at the same time.

Claim 4.  Under Claim 4, counsel is alleged to have been ineffective for not moving to suppress Edwards's "custodial" statement to Detective Hall and his interview with the television reporter.   Edwards alleges that counsel should have argued Edwards's *Miranda* rights were violated because he did not "voluntarily, knowingly, intelligently" waive his right to counsel when talking with the detective.  Dkt. 20 at 7 (citing *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Dickerson v. United States*, 530 U. S. 428, 434 (2000)).   However, counsel was not ineffective because the statement was not made during a custodial interrogation.

> The procedural safeguards prescribed by *Miranda* only apply "where there has been such a restriction on a person's freedom as to render him 'in custody.'"  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam )).  A person is "in custody" for purposes of *Miranda* if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest.  *See Stansbury* [*v. California*], 511 U.S. [318,] 322 [(1994) (per curiam)].   The proper perspective for determining whether a suspect is "in custody" at the time of questioning is whether "a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest."  *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

*Burket v. Angelone*, 208 F.3d 172, 196–97 (4th Cir. 2000).

Edwards's circumstances are similar to that of the defendant in *Burket*.  Burket voluntarily accompanied the detectives to the police station.  The detective told Burket he was not under arrest and he was free to leave at any time.  Burket was not handcuffed and although the interview door was closed, the detective told Burket it was for privacy so that the noise in the station would not interfere with the interview.  The detectives again advised Burket he was not under arrest and was free to leave.  During the course of the interview, Burket stated he was going to need a lawyer.  In response, the detectives again reminded him he was not under arrest and was free to leave, and Burket continued to talk with the detectives.  *Id.* at 195.  The Fourth Circuit rejected Burket's argument that he was in custody, finding that "[i]n light of these facts, Burket was not entitled to *Miranda* warnings after he stated 'I'm gonna need a lawyer.'"  *Id.* at 197.

*Miranda* warnings are only necessary "when there is a custodial interrogation." *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010) (citing *Mathiason*, 429 U.S. at 495). Where a defendant is told he is not under arrest, he is free to leave, the defendant is "cooperative" and "polite" during the interview, the defendant does not ask to end the interview or refuse to speak with the officers, and does not object to any of the questions asked, a court does not err in finding that under the circumstances, the interview did not "constitute a 'custodial interrogation' that invoked his right to be read *Miranda* warnings." *Hargrove*, 625 F.3d at 182; *see, e.g.*, *Burket*, 208 F.3d at 198 (request for a lawyer when suspect was not in custody and was told that he was free to leave did not render subsequent admissions inadmissible).

Here, Edwards cooperated with Detective Coerse at the scene, and when Detective Hall approached him and asked him "if he would accompany [Hall] to [her] office and speak to [her] there . . . he agreed to do so." 9/18/13 Tr. at 250. Edwards sat in the front seat as they drove to the police station. *Id.* Detective Hall brought Edwards to an interrogation room, left him there with door open, and Hall told him she would return. Video at 0:0:14. Edwards sat in a chair and was not handcuffed. Hall returned a few seconds later and asked Edwards if he objected to her closing the door for privacy and Edwards said no. *Id.* at 0:0:25. She thanked Edwards for cooperating and coming down to talk with her, reminded him he was not under arrest, and explained that she would take him home after they were done. *Id.* at 0:0:32–40. Edwards became emotional at one point. *Id.* at 0:25:11. Hall allowed him to talk about his feelings and did not ask any substantive questions for slightly more than a minute. *Id.* at 0:26:17.

After the pause, Edwards was still trying to regain his composure and Hall allowed him a respite. *Id.* at 0:26:27–0:27:08. After a second pause, Hall asked Edwards an open-ended question, to simply tell her about J.L. and his personality. *Id.* at 0:27:08–40. The next question about the

events that night occurred a short time later when Hall asked Edwards about his relationship with J.L. *Id.* at 0:28:21. About forty minutes later, Hall took a short break and asked Edwards if he wanted anything to drink. Edwards asked for some water, which Hall got for him and Hall also reminded Edwards she would be taking him home. *Id.* at 1:05:16–34. The door was left open during this break. The next thirty minutes or so of the interview was primarily going back through the sequence of events and clarifying a few points. Hall asked Edwards if he would give her the watch that had struck J.L. in the mouth and Edwards handed the watch over to a second officer who entered the room with an evidence bag and left after a few seconds. *Id.* at 1:34:45–1:35:17. Hall asked Edwards if he wanted more water, he said no, and she went to find her partner to take Edwards home and left Edwards alone in the interview room with the door open. *Id.* at 1:35:20–1:35:29.

Then, from the doorway, Hall asked Edwards if he would "be around tomorrow." *Id.* at 1:35:38. Edwards responded that he was not sure and stated he may be at the hospital. In response, Hall asked Edwards if he needed to be taken to the hospital and if he thought he might hurt himself. Edwards said he did not want to hurt himself and confirmed that he felt "overwhelmed" by "a bunch of [the] stuff going on." *Id.* at 1:35:40–1:37:47. Leaving the door open, Hall exited the interrogation room to check on something and then the interview ended. *Id.* at 1:38:25. Given these circumstances, Detective Hall's interview did not constitute a custodial interrogation that warranted *Miranda* warnings, and there was no basis to move to suppress the statement. *See Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005) ("Counsel is not required to engage in the filing of futile motions.").

With regard to the television interview, this Court recently rejected a similar challenge to the admission of statements made to journalists, noting that

> [T]he Supreme Court has clearly held that coercive state action is a necessary predicate to exclusion. *See Colorado v. Connelly*, 479 U.S. 157, 165 (1982) ("Our 'involuntary confession' jurisprudence is entirely consistent with the settled law requiring some sort of 'state action' to support a claim of violation of the Due Process Clause . . ."). Generally, state action takes the form of coercive conduct by law enforcement;[] the mere admission of a purportedly involuntary confession at a criminal trial does not satisfy the state action requirement. *See Connelly*, 479 U.S. at 165–66.

*United States v. Elsheikh*, 578 F. Supp. 3d 752, 775 (E.D. Va. 2022) (footnote omitted). *Elsheikh* further provided that

> it is important to note that Defendant, under his involuntariness argument, seeks to suppress statements made to media outlets in 2019. Accordingly, the relevant questioning of Defendant was also conducted by purely private individuals, namely journalists not affiliated with any government. Put simply, it is difficult to see how Defendant alleges anything more than "outrageous behavior by . . . private part[ies]," which is insufficient to support constitutionally-required exclusion. *Connelly*, 479 U.S. at 166.

578 F. Supp. 3d at 775, n.26. As with the alleged *Miranda* violation, there was no basis for counsel to move to suppress Edwards's interview with the reporter. Accordingly, Claim 4 has no merit under either prong of *Strickland*.

Claim 5. In Claim 5, Edwards alleges counsel was ineffective for not questioning the prosecution's key witnesses, failing to obtain an expert witness for the defense, and merely "going through the motions." Dkt. 1 at 24. This claim is conclusory. Edwards fails to identify the witnesses that were not questioned or provide a proffer of their testimony; he has failed to identify an expert or provide a proffer of the expert's testimony; and his "going through the motions" allegation is not only conclusory but is also refuted by the record.

The record establishes that trial counsel cross-examined each of the prosecution's witnesses. Trial counsel also used his cross-examination of the prosecution's experts to bring out points that favored Edwards's defense. For instance, counsel asked the doctor who performed the autopsy, and testified to the numerous bruises on J.L., if CPR had been performed incorrectly,

"could [the misapplication of CPR] be consistent with" the injuries found on J.L.'s body. 9/17/13 Tr. at 159.   The expert admitted that misapplication of CPR could explain bruising in the chest area and areas adjacent to the chest; that one of the bruises to J.L.'s head may have been healing for as long as "a week[;]" and that pinching a victim is an aspect of CPR that is intended to arouse the victim.   *Id.* at 159–60, 165.   Counsel also cross-examined the forensic pediatrician on the inability to determine when or the sequence of the various bruises; that the expert had not been provided with or watched the ninety-minute interview with Edwards; and that J.L. had eczema, which causes skin decolorization and rashes that itch. 9/18 Tr. at 294–96.[28]

The record also establishes that trial counsel obtained the police department's summary report; other law enforcement reports (search inventories, physical items recovered, evidence vouchers, the autopsy report, witness statements, police memoranda, and EMS reports); the defendant's statements to law enforcement officers; the hospital records for J.L.; the pediatric expert's report; Edwards discharge documents and his criminal record; and other items.   Circuit Court Rec. at 12–14.   Prior to trial, counsel successfully moved for Edwards to undergo a mental examination to determine his competency to stand trial and his mental condition at the time of the

---

[28] "When a petitioner's ineffective assistance of counsel claim rests on trial counsel's failure to call particular witnesses, expert or otherwise, we require 'a specific proffer . . . as to what an expert witness would have testified.'" *Vandross v. Stirling*, 986 F.3d 442, 452 (4th Cir. 2021) (citation omitted).   A petitioner's failure to do so "reduces any claim of prejudice to mere speculation and is fatal to his claim." *Id.*; *see Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) ("[A]n allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced."); *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990) (dismissing claims of ineffective assistance of counsel where petitioner failed to make a specific proffer of the testimony of the omitted witness); *see also Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994) ("[W]ithout a specific, affirmative showing of what the missing evidence or testimony would have been, 'a habeas court cannot even begin to apply *Strickland*'s standards' because 'it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiency in counsel's performance.'") (quoting *United States ex rel. Partee v. Lane*, 926 F.2d 694, 701 (7th Cir. 1991)).

offense. *Id.* at 10–11.[29]  On June 11, 2013, on trial counsel's motion, the circuit court held a hearing and the parties agreed on redactions to the television interview, and three short segments of his interview with Detective Hall that concerned Edwards's psychiatric history; Edwards's use of marijuana and other prescription drugs while in the military; and the phrase "military discharge." *Id.* at 26.  Given these facts, Claim 5 fails to meet either prong of *Strickland.*

### B. Claims 2 and 3

In Claims 2 and 3, Edwards alleges the evidence was insufficient to support his convictions for second-degree murder and child neglect.   The sufficiency of the evidence claims were presented on direct appeal through the Supreme Court of Virginia and therefore exhausted.   Thus, they are evaluated under AEDPA, which provides that "a federal court may not grant a state prisoner's habeas application unless the relevant state–court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009).  "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 20 (2013).

An unreasonable application of federal law is not the same as an incorrect application. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *accord Renico v. Lett*, 559 U.S. 766, 772–73 (2010).  That is, the state court's judgment "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotations

---

[29] The report in the record indicated that Edwards was competent to stand trial.  Only trial counsel was provided with the other portion of the report.  As noted above, evidence of the defendant's mental state was only admissible if it satisfied the test for insanity. *See, supra* at 22–23.

and citation omitted); *see Harrington*, 562 U.S. at 103 (state decision is unreasonable application of federal law only if the ruling is so "lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement").

This "highly deferential standard . . . demands that state court decisions be given the benefit of the doubt." *Renico*, 559 U.S. at 773 (internal quotations and citations omitted). "The required deference encompasses both the state court's legal conclusions and its factual findings." *Lenz v. Washington*, 444 F.3d 295, 299 (4th Cir. 2006). "'[A] determination on a factual issue made by a State court shall be presumed correct[.]'" *Tucker v. Ozmint*, 350 F.3d 433, 439 (4th Cir. 2003) (quoting 28 U.S.C. § 2254(e)(1)). "In reviewing a habeas petition, federal courts must presume the correctness of a state court's factual determinations unless the habeas petitioner rebuts the presumption of correctness by clear and convincing evidence." *Green v. Johnson*, 515 F.3d 290, 299 (4th Cir. 2008); *see Schriro*, 550 U.S. at 473–74. Section 2254(d)(1), as amended by AEDPA, provides for a "backward–looking . . . examination of the state–court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time—*i.e., the record before the state court*." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (emphasis added).

A federal habeas petition warrants relief on a challenge to the sufficiency of the evidence only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The relevant question in conducting such a review is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (citation omitted). A federal court sitting in habeas has "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Cagle*

*v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) (citation omitted); *see United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983) (citations omitted) (holding that federal habeas courts, when making a sufficiency of the evidence determination, do not weigh the evidence or review the credibility of witnesses).

Here, as set forth above, the evidence is sufficient for the trier of fact to have found Edwards guilty of both offenses. Accordingly, Claims 2 and 3 of Edwards's petition are without merit.

## IV. Miscellaneous Motions

Petitioner has also filed  motions for subpoena *duces tecum* to obtain transcripts of a telephone call he alleges he participated in back in 2019, the appointment of an expert, and also for an evidentiary hearing. Dkts. 33-1 at 1–2, 35, 36, 38, 40. Rule 6 of the Rules Governing § 2254 cases authorizes a district court to permit discovery "only if and only to the extent that the district court finds good cause." *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000). "Good cause may be found when a petition for habeas corpus relief 'establishes a prima facie claim for relief.'" *Id.* at 814 (citation omitted).

Here, there is no need for discovery, appointment of an expert, or an evidentiary hearing. The actual innocence argument presented does not refute the cause of death established at trial and affirmed on appeal, and Edwards's own averments show that he was the only possible cause of the fatal injuries during the roughly two-hour window between when Lewis left and then returned.[31]

---

[31] The Virginia Court of Appeals opinion is the last reasoned decision regarding sufficiency because the Supreme Court of Virginia refused Edwards's petition for appeal in a summary order. In evaluating a claim subject to 28 U.S.C. § 2254(d), a federal court looks to the last reasoned state court decision. *See Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 525 (4th Cir. 2016) ("In applying § 2254(d) . . . we 'look through' the Supreme Court of Virginia's summary refusal to hear [the petitioner's] appeal and evaluate the [Virginia Court of Appeals'] reasoned decision on [the habeas petitioner's] claim.") (citing *Brumfield v. Cain*, 576 U.S. 305, 313 (2015); *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991)). "In other words, the state-court decision that we review

In short, none of the discovery sought (alleged telephone calls between Edwards and Lewis, over five years after the trial) or possible expert testimony places anyone else in the room with J.L. other than Edwards during that two-hour window that the fatal lacerations were inflicted. "Simply put, Rule 6 does not authorize fishing expeditions." *Id.*; *Deputy v. Taylor*, 19 F.3d 1485, 1493 (3d Cir. 1994) ("petitioners are not entitled to go on a fishing expedition through the government's files in hopes of finding some damaging evidence.").

Accordingly, Edwards's motions for discovery, appointment of an expert, and an evidentiary hearing will be denied.

## V. Certificate of Appealability

According to Rule 11(a) of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." R. 11(a), Rules Governing Section 2254 Cases U.S. District Courts; *see also* 28 U.S.C. § 2253(c)(1)(A) (prohibiting an appeal to the respective court of appeals from a final order concerning a habeas corpus petition "[u]nless a circuit justice or judge issues a certificate of appealability"). A certificate of appealability ("COA") will not issue absent "a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

---

for 'objective reasonableness' under AEDPA's highly deferential standard is that of the" Virginia Court of Appeals. *Id.*

Where a district court dismisses a petition solely based on procedural grounds, and does not address the underlying constitutional claims, *Slack* instructs the court to issue a COA only when the petitioner demonstrates that "jurists of reason" would find both the petition's "claim of the denial of a constitutional right" and the district court's dispositive procedural ruling "debatable[.]" *Id.* at 484. As to whether the procedural ruling is "debatable[,]" *Slack* further advises that when the procedural bar present is "plain" and "the district court is correct to invoke it to dispose of the case," "jurists of reason" could not find "that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Id.*

Here, Petitioner's petition will be dismissed, in part, because Petitioner failed to file his federal petition for a writ of habeas corpus within the one-year statute of limitations permitted under 28 U.S.C. § 2244(d)(1). Where such "a plain procedural bar is present[,]" this Court finds that "jurists of reason" would not and could not "find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Thus, this Court will not issue a COA to Petitioner.

Petitioner may, however, seek a COA from the United States Court of Appeals for the Fourth Circuit. Where a district court denies a COA, the petitioner "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." R. 11(a), Rules Governing Section 2254 Cases U.S. District Courts.

## VI. Conclusion

For the foregoing reasons, Respondent's Motion to Dismiss (Dkt. 29) will be granted, and Edwards's motions for subpoena *duces tecum* (Dkt. 35, 38), appointment of an expert (Dkt. 36, 40), an evidentiary hearing (Dkt. 33-1), and to Review in Support of Memorandum in Re. Petitioner's Rule 5 Gov. 2254 "Traverse" and "Revised" Rule 34 Motion to Subpoena (Dkt. 39) will be denied. An appropriate Order and judgment shall issue.

Entered this 4th day of March 2024.
Alexandria, Virginia

_____ /s/
Patricia Tolliver Giles
United States District Judge